Mr. Farhane has not waived privilege with respect to six of the seven supposed waived subjects in the District Court's order. Other than with respect to Topic 1, the potential denaturalization or deportation consequences of his guilty plea, Mr. Farhane has not relied on his communications with counsel in asserting his Strickland claim, and fairness to the government does not require the broad waiver of the District Court order. The Court's order was an abuse of discretion, mandamus should be granted, and the order vacated. As to Topics 2 through 5, Mr. Farhane nowhere relies on communications with counsel to establish his desire to live in the United States, the nature of his ties to Morocco, or his attitudes towards American citizenship. As to Topics 6 and 5 — Mr. Farhane What do you mean, I guess, by rely on? I mean, if — you've made assertions about what counsel represented or didn't tell your client, and so how can those representations be tested unless the documentation is provided? We concede as to Topic 1, which is the potential denaturalization or deportation consequences of the guilty plea, that communications between Mr. Farhane and his trial counsel, Mr. Houston, are waived. The government is free to test whether that advice was given, but beyond that, the broad topics that the district court ordered — for example, to go to the jugular, Topic 6, which is the perceived strength of the government's evidence, including potential trial defenses — there's nothing in the affidavit that waives it, nor is there anything in the nature of Mr. Farhane's particular — Hang on. On paragraph 28 of Mr. Farhane's affidavit, he says, Mr. Houston told me it was not a good idea to go to trial. He told me a jury might be more likely to convict me because I was Muslim and did not speak English like a native speaker. So your client has reported what his lawyer told him as to whether it was a good idea to go to trial. Would you agree — Well, let me ask you this. Would it be fair, if there were a question posed to the lawyer, did you tell Mr. Farhane whether it was a good idea to go to trial? Would that be a fair question? Your client said that the lawyer told him it was not a good idea. Has he waived the privilege as to that statement? I think that that particular question would be a fair question to pose to Mr. Houston. Okay. So let's build on that, then. Yeah. Would it be a fair question, then, to say, well, Mr. Houston, why did you tell your client it was not a good idea to go to trial? Or does your client get to basically say, this is the bottom line my lawyer said, but I'm not allowing you to know why he said that? Because he gave one reason. Well, so I think that the government is free to test the truth of the statements made on  Well, let's be very precise about my questions. Yeah. Your client said that the lawyer said it was not a good idea to go to trial, and then your client gave one reason, said a jury might be more likely to convict me because I was Muslim. What if, if we were to actually know what went on, Mr. Houston said, well, yeah, but I told my client there were ten reasons it was not a good idea to go to trial. Mr. Parham has disclosed one of the ten. You're saying that because he's disclosed one of the ten, but only one of the ten, Mr. Houston can't give the other nine reasons? So No, no, just answer that question. I think the answer is yes, and I think there's two reasons. The first one is I think that the strength of the government's evidence at trial is legally irrelevant to the prejudice claim. The Supreme Court said that in Jay Lee. In the unique circumstances of a Strickland claim, where the claim is that trial counsel failed to give advice that would inform the court, the defendant's decision about whether to take a guilty plea or not, it could be the case that the defendant has literally no defense at trial. And it still doesn't matter because prejudice is present. Well, I guess I'm kind of, there's two different things there. One is you're saying it's not relevant to prejudice, but is that strictly the boundary of a waiver of attorney-client privilege? I thought the waiver is what someone discloses. So if he says in this affidavit, and I told Mr. Houston that I like to drink coffee, are you saying that he hasn't waived any communications about whether he likes to drink coffee because it's not necessary to the adjudication of the ineffective assistance claim? I think that's exactly right. So I think that's  Even though he said out loud. I mean, let me take this. Put aside the affidavit. He walks out in the street, goes up to a microphone in front of a press conference and said, I told my lawyer I don't like to drink coffee. Anyone would say he's waived his privilege as to that statement as to whether he told his lawyer he liked coffee, right? He's disclosed it to a third party. Yeah, for sure. So he has disclosed it to a third party. And I think what I'm getting at is there's two issues here. One is whether he has actually just waived it. And another one is, is there additional stuff that he's impliedly waived because it's necessary to the adjudication of the claim?  And I'm asking how he has not expressly waived by saying one of the reasons why his lawyer told him that he shouldn't go to trial. He has not expressly waived. For whatever reason, he has just laid open the questions about why his lawyer told him he should not go to trial. So I think that as to the statements made in the affidavit, there is an express waiver. There's still a question of determining either on an express waiver, which the government doesn't argue. Yeah, let's stick with that for now because I'm thinking about it. Well, understood. But just to – I don't think the government argues that. They swing for the fences and say when you make a Strickland claim, there's an implied waiver as to all communications with counsel. I think even on an express waiver analysis, you have to determine what is in scope for the purposes of that express waiver. And I don't think – and I do think that that's informed, and all of the case law says this, including this Court's decision in Erie, it's informed by fairness to the adversary. Does the adversary have the ability to test the premise of that proposition?  So he, Mr. Farring, has given one of the reasons his lawyer gave. Why is it not fair to the adversary to say, well, what are the other reasons he gave? I think you can proceed incrementally in that sort of examination. Part of the problem here is that the district – But I thought you said you can't. No. Wait a minute. Because I did not understand you to say I'm okay with this going back to Judge Preska and asking a question at a time and seeing where each question leads. I thought your position is there's a wall and these questions can't be broached. So, look, in front of this Court, and I think that we made the arguments that none of these topics is waived, certainly if the Court agrees that these topics are waived, the determination of the scope is the necessary question for the Court to answer. The Court has ordered the disclosure of all communications touching on these topics before a single question is posed to Mr. Houston. The right way to do this, if you agree with the district court and the government that there's a scope question as to these waived issues, is to proceed incrementally. It's one thing to say, Mr. Houston, did you advise Mr. Farhan that he could be denaturalized as a result of the guilty plea? No. Why did you not do it? Because I wasn't even aware at that point in time that that was an issue, that it was a possibility. At that point in time, the examination stops. There's no – So can you help me out mechanically? What is your understanding of how things would proceed in the district court if we were to say to a farmer, denied petition for mandamus, would there then be an affidavit from Mr. Houston and then a production of any written communications that fall within these six categories? The order doesn't – the order orders him to give testimony and to produce communications, and there's no sequential dimension to the way the Court does it. I understand my client to be under – well, I understand Mr. Houston, by virtue of the district court's order, to be under compulsion to produce his entire case file as it relates to these six topics. That's not an appropriate way to conduct what I think should be done with a scalpel. It's a sledgehammer. It says give this all over, even if there is no need for it and even though it's not necessarily in scope. The idea that Mr. Houston would be free to testify to everything he understood – Why is there a need for it? I guess I'm not understanding why need is a category here. Again, take my example of your client goes out, and let's say gratuitously, goes and talks before a press conference about six topics, something as to if there's no need for him to have talked about the six topics. What all six topics are, I talked about my lawyer with X. He's waived the privilege. Sure. As to the government, regardless of – they don't have to demonstrate need for anything. He's waived it. It's just the protective bubble is gone. Wouldn't you agree? No, I don't disagree. I don't agree. Because I think that in – I don't agree that if a client discloses to the world confidential communications, the privilege still inheres. Tell me that. Because in an ineffective assistance of counsel claim, there always has to be some disclosure of privileged communications. And the idea that a defendant asserting ineffective assistance of counsel has to forgo the privilege protection – No, you're shifting the hypothetical. I'm in the hypothetical of the press conference. Yeah, a gratuitous disclosure – Let me make sure my question is clear. If your client were to publicly disclose confidential communications about six topics, why would he be able to assert that privilege as to anyone subsequently? I didn't think that's the law of the privilege. Tell me if that's wrong. I think with respect to a gratuitous disclosure at a press conference, it's waived. I think that the courts are particularly careful about disclosures in ineffective assistance claim. And I think the Ninth Circuit's decision in Pitica articulates this well. The government should not be at an advantage simply by virtue of the fortuity that someone got in a constitutionally ineffective assistance of counsel in their underlying trial. But is it an advantage? I'm – I guess I'm trying – I'm struggling with how – if the issue is whether counsel is ineffective in advising his client to plead guilty, how does the discussions around that, right? An attorney may say, look, if your interest is not to serve ten years but to serve two years or three years, then I encourage you to plead guilty. And that decision may be, I don't want to serve ten years because I have a two-year-old child, I have a parent that's in Morocco sick, I have – you know, there's so much that informs plea negotiations that I – help me understand how the privilege can be cut off sort of artificially at that point. Because it seems to me everything and anything relating to your client's life and the circumstances as they existed at the time would inform his attorney's advice. I completely agree with you on the hypothetical that you've given. The issue here is that he wasn't told the critical thing. So if the – But then when we get to prejudice, doesn't – doesn't then the court and the lawyer get the benefit of saying, look, there are plenty of clients who say, I know I'm going to be deported. Never mind denaturalization. I know I'm going to be deported and it's mandatory, but I'd rather take that risk and that risk is informed by what's going on, the circumstances, the events of what's happening. You know, what might be good advice today might not be good advice ten years ago or 20 years ago when that risk was not so great. So I would think that those discussions would inform that advice. But in that case, there were discussions about the relevant determinative consideration, which was the possibility of deportation. In your hypothetical, Your Honor, you said, I made the judgment at that point in time that I'd rather be deported than have all of these things happen. The problem here is there is no discussion in that record about the – But we don't know that, right? Because maybe, maybe there was a discussion. Maybe there was a discussion about factors that would lead that attorney to say, whoa, wait a minute. And we concede that's within scope. That's within the scope of Topic 1, and I think that's what my exchange with Judge Nardini suggested would be appropriate follow-on questions, whether that advice were given. But apart from that, the considerations that Mr. Farhan was weighing at that point in time I think aren't relevant, given that he did not know the one thing that would have driven the outcome. And I think that that's evidence of that. That's the one thing now, but the affidavit said that he also wanted to minimize time away from his family, and the deportation risk is something that may not have been consistent or been consistent with that goal. So there may have been a weighing going on at the time, too. You're asking us to take sort of a view of events as represented by you without saying that the document's underneath it. I think the government is free to examine that. They're free to depose Mr. Farhan. They don't need to ask what he told his lawyer at the time. They're free to test his credibility on that. I think the best evidence of that is, number one, in the courts and bank decision in this case, both Judge Walker and Judge Perez undertake the prejudice analysis, Judge Walker in dissent, Judge Perez in concurrence, and they never refer to anything in the affidavit or any communications with counsel. That's the same thing.  Well, we just kicked the question to the district court. I mean, not for nothing, but we signed on to the jury's opinion. So you're talking to participants. My recollection is we did not adjudicate the prejudice question. I think Judge Walker's concurrence goes on the prejudice issue at length, and Judge Perez says this should be remanded to the district court in the first instance, but let me respond to what Judge Walker says. So I'm not saying it's binding in any way. All I'm saying is that that exercise was undertaken on both sides of the ledger without citing anything in the affidavit pointing to objective evidence in the record, including what Mr. Houston said in open – Right, but we're leaving it for Judge Perez to do. Absolutely. And I'm not – I'm not – I guess I'm – I thought the big takeaway from all the opinions was Judge Preska is going to preside over an adversarial testing of this. Absolutely. My only point is that it doesn't – Having sat on the majority, I'm pretty – my recollection is that's precisely what we were doing, counsel, letting the district court have a first shot at looking at the Strickland crime. I completely – yeah, I completely agree. I'm not suggesting that this Court has determined anything. My only point is just to evidence the fact that relying on communications between Mr. Farhan and his counsel is not necessary for that inquiry, especially to the extent that he hasn't waived it given the breadth of the waiver the government is urging. The Supreme Court did the same thing in Jay Lee. That was a case about whether a defendant was prejudiced when his lawyer failed to provide advice about the potential deportation consequences. And the Court's prejudice analysis doesn't rely on any communications between Mr. Lee and his counsel. There's plenty the government can rely on in fairness to test the truth of the allegations that Mr. Farhan makes about what he was considering at the time. But the critical distinction here between your hypothetical and this case is there was no advice given. And the government is free to test that proposition. They can ask Mr. Houston whether he gave the advice. They can ask him why he didn't give the advice. He didn't give the advice because he didn't know, for example, that Mr. Farhan was naturalized to this. He says, well, I didn't give the advice because he told me that he, I don't know, he loves America so much and he's not afraid he'll be deported. Or he hates America and he doesn't really care if he'll be deported. What if that were the answer? Because you just said you could ask Mr. Houston why he didn't give the advice. What if that's the answer? You're saying that they can ask the question, but they can't necessarily get the answer? Yes. So let me, let me. No. Yes. Let me qualify. I think that the question would need to proceed a little bit more incrementally. That's what I'm worried about. Yeah, so I think. You're throwing that out as a question that can be asked, but I'm pretty sure if you got deported to Nebraska, you'd say, no, no, no, you can't ask that question. So I think the question is, did you give him any advice about denaturalization? I suspect the answer is no. Were you aware at the time that you had to give advice to a client who was a naturalized citizen about denaturalization? The answer is going to be no, I think. If it's no, I think the questioning stops there. There's no further need for any discussion of what advice was traded between counsel and the client. But when you get to prejudice, what you seem to be saying is, look, the prejudice, what's relevant and not relevant or the prejudice standard changes, if the bad advice was you won't be deported or there's no risk or a minimal risk versus not addressing it at all. Absolutely. I think that's exactly right. I think that's what the Supreme Court said in J. Lee. How does that change when it comes to, I understand the first prong, but how does it change when it comes to prejudice? When the court has to look at sort of not getting that advice or getting bad advice, how would it have changed, if at all, the calculus? Because the question is you have to look at what was motivating the defendant's decision. I think you have to look, yeah, you have to look at what's motivating the defendant's decision, but I think you have to look at whether the client, even if there was no available defense at all, whether the client would have gone to trial if he had been properly advised of the consequence of a guilty plea. And Mr. Farhan is entitled to make that, to prove that case however he wants, but I don't think that by virtue of his affidavit or the nature of his Strickland claim, he has put into issue. Having sat as a state court judge where we canvassed folks on whether they were advised about deportation, had plenty of clients say, yeah, yeah, I'm a citizen. I'm a citizen. We don't need to talk about that. And counsels say, no, Your Honor, what's concerning him most is how much time he's going to do. He has a sick child, whatever it is. He's not worried about that. Why shouldn't the court be able to ask questions that deal with what's motivating the defendant to take a plea that would inform that decision or to hit that pause button or the red flag? They're welcome to ask the question. The question is whether they're entitled to privilege communications between attorney and client about that issue. But you can't selectively say, you know, it sounds like you're advocating for a sort of selective waiver of the privilege. I don't think I'm asking for a selective waiver. I'm asking for a properly defined scope of the waiver to be defined. And again, just to take the distinction between that, selective or scope. So I think they may be synonymous, but I think every case this Court has issued on the scope of an implied waiver or an express waiver, and all of the cases arising in the same ineffective assistance context, say the scope of the waiver needs to be carefully defined to turn only on the facts that the defendant is relying on, the specific assertions of fact that the defendant is relying on. Isn't that a key word, relying on? And what is counsel relying on what he's hearing from his client? But I think that's different from what — It's not a one-way conversation, right? Understood. But I think the difference is, what is the defendant relying on in the habeas proceedings and not necessarily in the district court? I don't think that the mere fact of asserting an ineffective assistance of counsel claim is a blanket waiver for all communications. It has to be defined by something. And I think in the ineffective assistance context, it's defined by the scope of the Strickland claim being pressed. And all of those claims — I mean, you know, I understand if during the conversations the client said, don't tell anybody, but five years ago I committed a murder. You know, I understand that that, you know, other crimes, things that are not relevant to the decision that led to taking a plea or not taking a plea. But I'm struggling with how you can sort of say, well, you know, you can talk about three things that impact his decision whether to take the plea but not four or five. Do you see what I mean? I completely understand what you're saying, and I'll — I think you want me to finish up, so I'll wrap up. We have a few more questions. Okay. Both sides. Both sides. Okay. Great. I'm mindful of the red dot. I completely agree with you. I do think that this ineffective assistance claim, I don't want to say it's unique because it comes in the Padilla family of cases, but it is different from misadvice. And the Supreme Court said that in Padilla, omission of advice is different from misadvice. It reiterated the point in J. Lee. When you are not given advice about an important consideration, a sufficiently important one that this Court said rises to the level of a constitutional infirmity, what you were considering at that point in time I think is of diminished relevance in the idea that the waiver needs to be cognized so broadly to give the government, in the interest of fairness, the ability to prove those privileged communications as to, for example, the strength of the government's case. I just don't think it comes within the scope of the waiver or, in fairness, is necessary to the government to disclose. Can I ask you to turn your attention to the second question, which we haven't touched on yet, which is the scope of the protective order? And my first question, and this will also be a question for the government, I'm not sure I understand whether the parties have a shared understanding of what the order means. Yeah. And I'm looking at, well, both pages 106 and 108 of your appendix. And it says the government is prohibited from using the information disclosed. And that's the same language used on 106 and 108. Right. So my first thought was whether this is use or derivative use. I'm tending to think by analogy with the immunity context. And whether this is, as I think both the parties are interpreting it, as a direct use. In other words, you couldn't, the government wouldn't be able to submit, I don't know, let's say there are e-mail communications between Mr. Huston and Mr. Farhain. Those could not be introduced as an exhibit in a future criminal case, say. But I tend to think that maybe both of you are thinking that the order as currently framed would allow derivative use. Yeah. But I was reading this to suggest in my inferential reading that it was more of a Kassigar situation. That she was saying, well, there's no real problem with letting attorneys share this information because they can't use it. So if it were use construed broadly, one question in my mind is would the government then be sort of acting at its own peril in not, say, having a team or having some future prosecution team screened off from this because then there would be, say, a Kassigar hearing or something like that. So could you help me understand what you think the order means and then what you think you would want it to say, assuming for the sake of argument at least some information gets disclosed? Yeah. So I think you've got it right. And I think the ambiguity arises from the fact that Judge Preska rejected our request to prohibit the government from accessing or consulting any such materials in any other proceeding. And that's at the bottom of 106. And so clearly Judge Preska believed there was a difference between a prohibition on use and a permission to access or consult. And so I view it the way you do, which is as drafted or as issued, this order prohibits only the use, the admission for evidence. And I think the challenge with permitting, accessing, and consulting, it's what Judge LaValle said in his district court decision in Ulbricht. You can't cause the lawyer to sort of lose an understanding or a view of what documents said. It points them down a particular path. It causes them to ask a particular question. And the disclosure of that information as a necessary adjunct to proving a constitutional ineffective assistance claim shouldn't prejudice Mr. Farhan in future proceedings, be they a criminal case, a retrial on the vacated conviction, or in the denaturalization proceedings. And so I think a prohibition on having anyone other than the team litigating this hideous claim in the Southern District is necessary to ensure that he's not put in a worse position on criminal retrial or in the denaturalization case than he would have been had he gotten constitutionally adequate counsel the first time around. And if this were to be construed, or say rewritten by Judge Prescott, to be sort of in the cast-a-carving, let's say, would you agree, then, it would be sort of at the government's peril not to use some sort of screening mechanism? It would be messy, I suppose, afterwards to figure out, well, who had access to what information. Yeah. Like a fruit-of-the-poison-tree sort of a situation. Yeah. It's hard to answer that question. No. I think the better course is to order the government to use a different team. That's what I think the Ninth Circuit didn't get across.  That would be the prophylactic rule to say, well, we'll never have to have a cast-a-car hearing if there is some future proceeding. Right. We don't know if there will be a future proceeding. Maybe there won't be a future proceeding. And if there will, we'll cross that bridge. When we get there and if we need to have a cast-a-car hearing, we will. But you're saying that there's a prophylactic rule assuming it bars derivative use. Right. Yeah. I mean, I think it's a lot easier to never make the omelet than to have to unscramble the omelet. And so it doesn't seem to be particularly prejudicial to the government to have to do that. Biddecker and Korr were both 2254 cases, and the court was dealing with the question of whether they could conscript state resources into dividing their attorney teams in that way. And they both said, yes, it's constitutionally required. I think, if anything, the question is easier here in the 2255. We've kept you well over your time. Thanks very much. We'll hear from the government. Good morning, and may it please the Court. My name is Jun Xiong, and I represent the United States on this appeal and in this court. Judge Preska did not abuse her discretion when she found that the defendant waived the attorney-client privilege over specific categories of communications on which he relied and that were necessarily relevant to a strickling claim, nor did she abuse her discretion when she crafted a protective order that expressly prohibits the government from using the way of communications in any other proceeding. I want to start by following up on some of the colloquy between Judge Nardini and my adversary as to what happens if, you know, one reason for not going to trial is disclosed. And I think that goes to the heart of this Court's implied waiver jurisprudence, which has often been called at-issue waiver, because what's waived is not the communication itself. It's the issue on which that communication bears. And so let's take a different hypo. Say it's a very classic implied waiver scenario where a criminal defendant is relying on advice of counsel to say, look, I was told by my lawyers that this was okay, and discloses an e-mail on Monday, right? This Court would never construe that to say, well, the only thing that's waived is that e-mail or that e-mail chain if, in fact, there were contextualizing communications the week before, there are carve-outs, qualifications the week after, right? The waiver is over all communications about whether this course of conduct was okay or not okay. And I think today and in the briefing, Mr. Farhan has cast his claim as, well, this is a Strickland claim about denaturalization. Well, that's not quite right. This is a Strickland claim of a type that occurs frequently. It is a Strickland claim that a defendant would not have entered a plea but for his attorney's failure to provide advice or misadvice. And that sort of Strickland claim requires not only that the petitioner bear the burden of showing the advice or misadvice, but also the second part, the second part of Strickland, that he would have, there was a reasonable probability of a different result had he not received efficient performance from counsel. And I think a lot of the focus on the briefing and today has been on the specific category about the perceived strength of the government's evidence, including potential trial defenses. And I just really want to hone in on that language because that language from Judge Preska mirrored a proposal from the government. And what matters there is the perceived strength, right? The government agrees that Mr. Farhan has not waived privilege as to the actual merits of anything, right, whether it's a legal argument or the strength of the   What matters for the Strickland prejudice inquiry, and the Supreme Court made this clear in Lee itself, was the 2255 petitioner's appetite for risk. What did they believe their risk to be at trial? And given their perception of that risk, you know, would they have gone for this plea or not if they had received different advice? So can I ask you, there are the six categories or subjects listed by Judge Preska, and I've been trying to match them up to pieces of Mr. Farhan's affidavit to say, okay, what did he say that could be viewed as a waiver as to A or B or C. And the one I'd like you to address is number three. No, no, I'm sorry, not number three. Number four, the defendant's attitudes towards . . . no, no. No, number three. The nature and strength of the defendant's ties to Morocco or another foreign country. Tell me where in your view they match up best, if at all, with something that Mr. Farhan said in his affidavit, because I feel like all the others I see. But this one may need some explanation. Understood, Your Honor. If I could just have a moment. Yeah, yeah, please. I mean, I have some ideas of what I think the government's view is, but I just want to hear you address that. Yeah, so I'll say a few things. Certainly, and I'll focus on that concept being communicated to counsel in a moment, but on the concept of affinity or ties to the United States versus affinity to ties versus Morocco, I think that's touched on in paragraphs 14, where he talks about he applied for citizenship because he felt a genuine connection to the United States and wanted to build the rest of his life here with his family, wanted to have the rights of a U.S. citizen. And I think 17 is sort of a flavor of that. It's on the inverse of four, then, I guess. I'm sorry, Your Honor? It sounds like you're characterizing three in nature and strength of ties to Morocco as the inverse of four or the flip side of four attitudes towards U.S. citizenship. Is that correct? I think that's fair to say, Your Honor. And I think to the extent it bears on the prejudice analysis, I could see this arising in the sort of conversations that Judge Kahn was talking about before, right, the sort of everyday conversations that a defense lawyer would have with a counsel client about, well, what really matters to you as we're going into plea discussions with the government? And you can imagine one version of those conversations being like, look, I'm charged with, in the weeks after 9-11, having conversations about financing jihadists. I understand the risk. And if this means that I can't stay in this country, that's not so bad. I still have family in Morocco. You know, I have ties there. And, by the way, you know, the ties to Morocco, there's not some huge secret about this. I mean, there was a lot of it's not in the affidavit in the same level of detail. There was a lot of this in the PSR, as the Court may recall, from the en banc litigation. So I think it would be part and parcel with if what he's contending now is that his appetite for litigation risk, in the face of attorney advice that, look, given the strength of the evidence or otherwise, you shouldn't go to trial, and he's saying, well, I loved America so much and I was so scared of being deported that I would have done it anyway, then I think that fairly comes within. I mean, could you address in particular, I was looking at paragraph 29, where it starts. I told Mr. Houston, oh, wait, make sure you have it in front. I told Mr. Houston my priority was to have the shortest separation from my family. My wife and all six of my children were financially dependent on me at that time. I wanted to return to them as soon as possible to resume my life with them in Brooklyn. I read that paragraph, even though each individual sentence doesn't say I told Mr. Houston, I told Mr. Houston. I interpreted all those three sentences because they're on a single paragraph 29 prefaced by I told Mr. Houston is implicitly, certainly saying I told Mr. Houston all of these things, and that the notion that he told his lawyer I want to go back to Brooklyn, I was reading that to me, and if he's claiming he told his lawyer, you know, Brooklyn is it, then one can question him, well, really, is that what he said or did he say there are other places that he likes, better or worse, or he hates Brooklyn or he hates the United States or whatever. So I took that as an affirmative statement that he communicated to Mr. Houston that his priorities and his preferences were to be in Brooklyn. And that seems to me that he's now opened up the question of where he told his lawyer he wants to be and why. I completely agree with that, Your Honor. And I think another paragraph that the Court might want to focus on is paragraph 38. At all times during Mr. Houston's representation of me, my priority was to minimize the length of my separation from my family and the harmful impact on the lives of my wife and children. A plea deal that opened the door to the loss of citizenship and deportation and that exposed two of my children to a similar risk was contrary to my priorities. And I think that's where he talks about priorities, and then you have to go back to paragraph 29, where he says I told Mr. Houston that my priority was. So he's already said I told my lawyer what my priorities were. And then if later he's elaborating on what his priorities were, he's opened the door, in your view, to any discussions about what he said his priorities were. That's exactly right, Your Honor. That's exactly right. And wouldn't also a simple – I'm trying to understand. In paragraph 39 and 40, he says, I would not have entered a guilty plea if Mr. Houston had told me that I could lose my U.S. citizenship as a result. Well, if there were conversations about his close ties to family in Morocco, and he talks about traveling to Morocco using the passport, wouldn't that be something his lawyer should be able to – I mean, the court has to assess the credibility of the witnesses here. Yes. So if he said something that would directly contradict that, wouldn't that be subject to the waiver? Shouldn't the lawyer be able to say, you know, contrary to what he's saying today, he told me information that would contradict that? I completely agree with that, Your Honor. And I think maybe the takeaway here is that the waiver is not a waiver even tethered to a specific paragraph, the multiple paragraphs, and the sort of interplay between the paragraphs in the affidavit. Unless there are further questions on the waiver point, I'll turn briefly to the protective order. You know, Judge Preska's approach here was more protective than the vast majority of district courts in this circuit. You know, most of the time, district courts do not require the sort of protective order that she issued here. I don't think I generally have seen protective orders at all in habeas litigation. I just usually see it as the defense lawyer usually files an affidavit. Sort of usually what I've seen is the defendant files at 2255. The court then gives permission to the defense lawyer to respond, and often there's not even a response from the government. And then the lawyer files an affidavit openly on the docket saying, well, you know, you've opened this up, here's what I told the guy. And then if necessary, and usually it's not necessary, there's an evidentiary hearing where the lawyer is called to testify and potentially the client testifies. But I don't think I've, as a practice, seen this stuff being subject to any protective orders. That's exactly right, Your Honor. And I think that approach, which has been uniform in the district courts, is consistent with the law about implied waiver. That there's not, Your Honors, I think earlier colloquially with my adversary, you know, there's not, from an analytical perspective, a whole lot of difference between filing a public docket, on a public docket, this affidavit, which has been public and has repeatedly cited and briefed and openly argued and available to the world. This affidavit, though, was not filed under seal. Was not filed under seal, and at no point was there an application to protect any of the disclosures during this litigation. And there's really no difference between that from a waiver perspective, by just on kind of nuts and bolts waiver law, than going out in the world and kind of orally saying each of the things that are said in the affidavit. I think on the protective order point, perhaps what Judge Preska, you know, was animating her being more protective of Mr. Farhan than usual, was the existence of this parallel denaturalization. Well, can you just tell me, though, what's the meaning of this order? Is it, again, I'm thinking in the terms in which we use the word use and derivative use in the immunity context, if that's a parallel. Do you understand this protective order to protect only against direct use or against derivative use as well? We think derivative use as well, but I actually think that – Because I read the government's brief, and I thought there was a line in there where you were describing this, and you say, the district court prohibited the government from, and I think the quote, you know, from, and then you stopped the quotes, and you said, from filing the disclosed information in future proceedings. She didn't say anything about filing. She said using. Correct, Your Honor. So I don't know, what do you understand using to mean? I think using means everything, but I actually think – Including derivative use? Yes, Your Honor. So that means that you would act at your peril if, let me make up a scenario. Let's say Mr. Farhan wins his 2255, and there is a retrial in the future. Would there then have to be a screened-off team that tries him? And when I say screened-off, screened-off from the folks who handled the 2255 in your office? No. No, Your Honor. Tell me why not. So I think the first part of the answer has to do with what we're even asking for. You know, as we made clear to Judge Preskill, and I think as her order makes clear, we don't want stuff relating to the underlying merits. I mean, that's what distinguishes, I think, this case from cases like Tower and Bitteker. I mean, those were full trials where what was turned over to the prosecution team was the full defense file. We don't want that stuff. And we care only about, because this is the only part that's pertinent to Strickland, the perceived strength and his sort of assessment of that in consultation with his lawyer. But how can you say the same problem I had with your opponent, you're trying to draw this line, his perceived strength or lack thereof of this case is intrinsically tied to the merits of the case. So there may be information that's discussed about his ties or not to Jihadists. And so I think it's hard to sit here in abstract and say, well, those conversations will not contain discussions about evidence, perhaps, that could be used in a subsequent trial. If he's successful in his petition. And so why is the government taking that risk? Why wouldn't you just have a different team, a walled-off team? I mean, that seems sort of silly. I don't understand why you're insisting that you as counsel or whoever's trying the case now, the petition before Judge Breska, would insist on being counsel at, you know, a subsequent trial if there is. I have a hard time believing, for the same reason you're arguing we shouldn't be limited in those communications about perception of the strength of the case, that there would be no information there that would be helpful to the government in a subsequent prosecution. So here's how we would envision kind of doing this practically, right? And let me give a hypothetical that is somewhat surfaced in this case, which is I think in some of the prior appeals litigation, Mr. Farhan has argued, look, I would have potentially mounted an entrapment defense. This was a case about recorded conversations with an informant. And what the government is interested in from trial counsel and over what, you know, privilege has been waived, is if trial counsel said, look, we spoke about entrapment. I told him that was a dead loser. That's been waived. If there's a memo explaining here are the legal arguments, here are the witnesses that we could marshal or not marshal, we don't want it, right? And we don't view it as being part of what Judge Breska has ruled has been waived. And so on the face of the order itself, we care only about conversations going to the perceived strength. Who are you going to use to review the materials you receive to make sure that you don't inadvertently get the information you claim you're not interested in? If they'd like to go ex parte to Judge Breska for her to make that determination, we're happy for that to occur. Again, we are not looking for what happened in Cower and Bideker, which is open file discovery from the defense, right? And then you have all these concerns about, well, given that breadth of discovery, how can you possibly tell what was used or derivatively used and so forth? Again, we're looking for something very narrow. We sought a scalpel, and Judge Breska granted a scalpel, which is the waiver of communications only as to the specific topic. If there's no – oh, go ahead. I'm sorry. If there is no – if Judge Breska decides not to review the material in camera, would the government agree to use a taintee to not produce something? If you're insisting on – if this – if you lose and this case goes to trial. So I think, again, maybe to stick with that hypothetical just to make it concrete, you know, what might happen there is trial counsel would alert everyone, hey, there's a memo about entrapment, right? That doesn't reveal anything beyond what I think everybody agrees should be waived. I think we could decide, the government could decide at that point, you know what? Hold that memo. We don't need to look at that. That moves the whole issue, right? I think it's only in the scenario where we take the position we want someone to scrub that memo for things that are waived versus not waived, where any of this is even remotely concerned. I guess what I'm concerned about is a communication that discloses something that the defense isn't aware may be useful to the government because it has leads elsewhere in its investigation. So, you know, as someone who sat in your position, I like to sleep at night. So disclosure was very broad because I don't know what the defense's case is, and you may not know what their case is. They don't know exactly all the evidence in your case necessarily and what – there may be leads there and information. So I guess I'm troubled by why you wouldn't use a DT. I suppose you still, you know. Yeah. I think the answer there is, to Judge Nardini's point, if we didn't use a DT, we would proceed at our own peril. I guess what I'm saying is that possibility seems pretty – pretty – is not at the core of what the government is seeking. It is not at the core of what Judge Preska has ordered disclosed. And in the event that there were litigation about that, I suppose the government could elect to – in order to mitigate risk, to have other folks litigate that issue in lieu of her reviewing it in camera. So I guess that leads me to what I hope is my final question, with the indulgence of my colleagues. And maybe it can be viewed as two ways, this question. One is, are we really – would we be jumping in prematurely right now to express anything really about the protective order? Because these ideas of what will be disclosed, how it might be used or not by the government, seems totally hypothetical at this point. And given that we don't know, will the government use a DT as a matter of discretion? Will it not? Will it, you know, as I said, sort of, you know, act at its own peril without really understanding what the consequences might be? But they would be sorted out at some later date. Is it premature for us to look at that? And I guess this is the related formulation of that question. We are here on a petition for writ of mandamus where we're supposed to be granting relief only if the right claimed is clear and undisputable. I understand that we do generally jump in when the question is one of whether privileged material should be disclosed. And I understand because once it's disclosed, the cat's out of the bag. But the niceties of the protective order, I wonder if it's arguable that we still are going to be affording the district court a fair amount of discretion in sort of how this protective order would play out. So I guess I would ask you to respond to those two thoughts of, you know, how much we should be fussing over the protective order now on a petition for writ of mandamus, knowing full well that, well, you know, something could go wrong in the future and the consequences will just have to be sorted out then. Yeah, I think Your Honor's questions are exactly right, which is the only question before this Court right now are whether the protective order and the decision overall as written were an abusive discretion that rises to the mandamus standard. And the answer is, if we're talking about, well, how do we interpret and implement this, the answer to that is clearly no, right? Because the implementation and interpretation wouldn't matter if, as Mr. Farhan contends, on its face this is a judicial usurpation of power. And so for that reason and the reasons set forth in the briefs, the petition should be denied and the government will rest on the briefs. Thank you very much. Thank you, counsel. Thank you both. We'll take the matter under advisement.